2010 AUG 24 PM 2: 55

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

FILED

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2010 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>KYLE CARRIERE,<br>　aka "Tree,"<br>LAWRENCE LIU,<br>ALLEN CHEN,<br>TONY DAM,<br>　aka "Trouble"<br>　aka "Ethan,"<br>MICHAEL CHEN,<br>STEVEN SETTINO SIINO,<br>NATHAN NWOBI,<br>BRIAN LY,<br>HENRY SONEY CHEN,<br>　aka "Elmo,"<br>RICHIE LE,<br>EDWARD SU,<br>JUN PAZ,<br>KATRINA YU,<br>　aka "katrina<3,"<br>ANDY LAI,<br>　aka "Smiley,"<br>ANGELA KIM,<br>SYLVIA HO,<br>JANE KIM,<br>SEONG CHUN TAN,<br>FENG YE, and<br>CHUN CHIN HU,<br><br>　　　　　Defendants. | CR 10-  CR 10 00952<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy<br>and Attempt to Distribute<br>Controlled Substances; 18<br>U.S.C. § 371: Conspiracy to<br>Commit Marriage Fraud;<br>21 U.S.C. §§ 841(a)(1),<br>841(b)(1)(A), (b)(1)(C),<br>(b)(1)(D): Distribution of and<br>Possession with Intent to<br>Distribute Controlled<br>Substances; 18 U.S.C.<br>§ 924(c)(1)(A): Possession of a<br>Firearm in Furtherance of a<br>Drug Trafficking Crime;<br>18 U.S.C. § 922(g)(1): Felon in<br>Possession of a Firearm;<br>18 U.S.C. § 922(a)(1)(A):<br>Engaging in the Business of<br>Dealing in Firearms Without a<br>License; 18 U.S.C. § 2(a):<br>Aiding and Abetting] |

1    The Grand Jury charges:

2                              COUNT ONE

3                         [21 U.S.C. § 846]

4    A.    OBJECTS OF THE CONSPIRACY

5          Beginning on a date unknown, and continuing to on or about

6    August 24, 2010, in Los Angeles, San Bernardino, Riverside, Santa

7    Barbara, and Orange Counties, within the Central District of

8    California, and elsewhere, defendants KYLE CARRIERE, also known

9    as ("aka") "Tree" ("CARRIERE"), LAWRENCE LIU ("LIU"), TONY DAM,

10   aka "Trouble," aka "Ethan" ("DAM"), MICHAEL CHEN ("M. CHEN"),

11   STEVEN SETTINO SIINO ("SIINO"), NATHAN NWOBI ("NWOBI"), BRIAN LY

12   ("LY"), HENRY SONEY CHEN, aka "Elmo" ("H. CHEN"), RICHIE LE

13   ("LE"), EDWARD SU ("SU"), JUN PAZ ("PAZ"), and others known and

14   unknown to the Grand Jury, conspired and agreed with each other

15   to knowingly and intentionally:

16         1.    distribute at least 50 grams of a mixture and substance

17   containing a detectable amount of methamphetamine, a Schedule II

18   controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and

19   841(b)(1)(B)(viii);

20         2.    distribute a mixture and substance containing a

21   detectable amount of 3,4-methylenedioxymethampetamine ("MDMA"), a

22   Schedule I controlled substance, in violation of 21 U.S.C.

23   §§ 841(a)(1) and 841(b)(1)(C); and

24         3.    manufacture and possess with intent to distribute at

25   least 1,000 marijuana plants, a Schedule I controlled substance,

26   in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vii).

27

28

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
     ACCOMPLISHED

     The objects of the conspiracy were to be accomplished in substance as follows:

     1.   Defendants LIU, DAM, and H. CHEN would supply defendant CARRIERE with MDMA.

     2.   Defendant PAZ would provide defendant CARRIERE with the name of defendant DAM as an MDMA supplier.

     3.   Defendants LIU, M. CHEN, H. CHEN, NWOBI, LY, and SU would cultivate marijuana for further distribution.

     4.   Defendant CARRIERE would sell tablets containing MDMA and methamphetamine, as well as firearms.

     5.   Defendant SIINO would drive defendant CARRIERE to MDMA and firearms transactions.

     6.   Defendant SIINO would sell MDMA.

     7.   Defendant LE would drive defendant CARRIERE to purported MDMA transactions.

C.   OVERT ACTS

     In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendants CARRIERE, LIU, DAM, M. CHEN, SIINO, NWOBI, LY, H. CHEN, LE, SU, and PAZ, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

     1.   On November 29, 2007, using coded language in a telephone call, defendant CARRIERE agreed to sell 1,000 tablets containing MDMA for $3,000 to an individual defendant CARRIERE

3

believed was a drug customer, but who, in fact, was an individual cooperating with law enforcement (the "CS"), at a restaurant in Ontario, California, where defendant CARRIERE had previously sold firearms to the CS.

2.     On November 29, 2007, in Ontario, California, defendant CARRIERE sold approximately 989 tablets containing MDMA and methamphetamine for $3,000 to the CS and asked the CS to let him know if the CS had any firearms for sale.

3.     On December 4, 2007, using coded language in a telephone call, defendant CARRIERE agreed to sell MDMA and a .357 magnum revolver to the CS and advised the CS that he (defendant CARRIERE) would include 16 extra MDMA tablets to make up for the shortage of MDMA tablets in their last deal.

4.     On December 7, 2007, defendant LIU supplied defendants CARRIERE and SIINO with approximately 500 tablets containing MDMA and methamphetamine.

5.     On December 7, 2007, in Ontario, California, defendants CARRIERE and SIINO sold approximately 500 tablets containing MDMA and methamphetamine and a Colt .357 magnum revolver, bearing serial number PN03218, to the CS for $2,200, and, after conferring with defendant LIU over the telephone, defendant CARRIERE told the CS that the CS could pay defendant CARRIERE an additional $200 next time they met.

6.     On January 24, 2008, using coded language in a telephone call, defendant CARRIERE offered to give the CS a sample of marijuana that defendant CARRIERE had available for sale and agreed to sell the CS a 9 millimeter handgun.

7.     On January 25, 2008, in Ontario, California, defendants

CARRIERE and SIINO sold the CS a Star 9 millimeter handgun, bearing serial number 1806451, for $600, accepted $200 from the CS for their prior drug deal, and agreed to supply the CS with 500 MDMA tablets.

8.    On January 25, 2008, defendants CARRIERE and SIINO drove from Ontario, California, to a house on Bruin Drive in Riverside, California, where they obtained approximately 500 MDMA tablets, which they then delivered to the CS in Ontario, California.

9.    On June 3, 2008, in Ontario, California, defendant CARRIERE sold a Smith and Wesson .22 caliber handgun to the CS for $500 and agreed to supply the CS with 500 MDMA tablets.

10.    On June 3, 2008, defendant H. CHEN supplied defendant CARRIERE with approximately 500 MDMA tablets.

11.    On June 3, 2008, defendant CARRIERE drove to his residence in Rowland Heights, California, and obtained approximately 500 MDMA tablets.

12.    On June 3, 2008, defendant CARRIERE sold approximately 500 tablets containing MDMA to the CS for $1,600.

13.    On September 19, 2008, using coded language in a telephone call, defendant CARRIERE advised an unidentified co-conspirator that he only obtained MDMA in 100-tablet quantities and stated that the price would be approximately $335 for 100 tablets.

14.    On September 21, 2008, using coded language in a telephone call, defendant CARRIERE told defendant LIU that he just traded 35 Oxycontin pills for a .380 caliber firearm.

15.    On September 28, 2008, using coded language in a

telephone call, defendant LIU assured defendant CARRIERE that he would be able to find the amount of MDMA defendant CARRIERE was looking for by the upcoming weekend.

16. On September 29, 2008, using coded language in a telephone call, defendant LIU told defendant H. CHEN that he was looking for pills that looked like actual controlled substances because he wanted to rip somebody off by providing him with pills that were not actual controlled substances.

17. On October 6, 2008, using coded language in a telephone call, defendant LY told defendant H. CHEN that defendant NWOBI wanted to know when defendant H. CHEN could start working in a marijuana grow house, and defendant H. CHEN said he would start working that Sunday.

18. On October 7, 2008, using coded language in a telephone call, defendant H. CHEN told defendant LY that he only needed 150 plants in order to start the marijuana grow house and that he was talking to defendant NWOBI about the number of plants defendant H. CHEN would use to start his marijuana grow house.

19. On October 7, 2008, using coded language in a telephone call, defendant CARRIERE told the CS that they could conduct an MDMA deal the next day and that he (defendant CARRIERE) could lower the price for the MDMA.

20. On October 7, 2008, using coded language in a telephone call, defendant PAZ told defendant CARRIERE that he (defendant PAZ) could provide 17,000 MDMA tablets for sale but that he did not want to because he did not like dealing in low quality MDMA, and defendant PAZ further informed defendant CARRIERE that he

(defendant PAZ) would need to make a telephone call to determine the availability of the tablets.

21. On October 8, 2008, using coded language in a telephone call, defendant PAZ told defendant CARRIERE that he could not supply MDMA to defendant CARRIERE because he was leaving town, but defendant PAZ referred defendant CARRIERE to defendant DAM, who defendant PAZ stated had "red heart" logo MDMA tablets available for sale.

22. On October 8, 2008, using coded language in a telephone call, defendant DAM informed defendant CARRIERE that he could sell 17,000 MDMA tablets to defendant CARRIERE, but he needed to check on the price for the tablets.

23. On October 8, 2008, using coded language in a telephone call, defendant DAM told defendant CARRIERE that the price for the 17,000 MDMA tablets would either be $2.20 or $2.30 per tablet.

24. On October 8, 2008, using coded language in a telephone call, defendant DAM told defendant CARRIERE that he was still waiting to speak with an unidentified co-conspirator to determine when they (defendants DAM and CARRIERE) could conduct their MDMA deal.

25. On October 8, 2008, using coded language in a telephone call, defendant DAM told defendant CARRIERE that defendant DAM's source of supply wanted $10,000 towards the purchase of MDMA before he would supply the MDMA, and defendant CARRIERE stated that his customer (the CS) would not front the money for this MDMA.

26. On October 8, 2008, using coded language in a telephone

call, defendant DAM told defendant CARRIERE that defendant
CARRIERE's customer (the CS) should pay $10,000 in advance for
the MDMA, and defendant CARRIERE said he would need to check with
his customer to determine if this was acceptable.

27.   On October 8, 2008, using coded language in a telephone
call, defendant CARRIERE agreed to meet the CS the following day
in Riverside, California, to sell MDMA to the CS, and told the CS
that he would call the CS when defendant CARRIERE was in
Riverside.

28.   On October 9, 2008, using coded language in a telephone
call, defendant DAM told defendant CARRIERE that he would lower
the price of the MDMA they were trying to sell to the CS, and
defendant CARRIERE said he would let the CS know the new price
for the MDMA.

29.   On October 9, 2008, using coded language in a telephone
call, defendant CARRIERE agreed to sell 8,000 MDMA tablets to the
CS after the CS told defendant CARRIERE that he/she (the CS) no
longer had enough money to buy 15,000 MDMA tablets, but instead
had enough money for only 8,000 MDMA tablets.

30.   On October 9, 2008, using coded language in a telephone
call, defendant CARRIERE told Allen Chen that he was on his way
to Riverside to conduct a drug deal and Allen Chen told defendant
CARRIERE to be careful with his drugs.

31.   On October 9, 2008, using coded language in a telephone
call, defendant DAM told defendant CARRIERE that he would meet
him in five to ten minutes.

32.   On October 9, 2008, in Riverside, California,
defendants CARRIERE and LE possessed approximately 8,000 tablets

1  purporting to contain MDMA.

2      33.  On October 17, 2008, using coded language in a
3  telephone call, defendants LY and H. CHEN discussed growing
4  marijuana, and defendant LY stated that defendant NWOBI was
5  complaining about the new marijuana plants they were growing.

6      34.  On October 17, 2008, using coded language in a
7  telephone call, defendants NWOBI and H. CHEN discussed the
8  condition of their marijuana plants.

9      35.  On October 19, 2008, using coded language in a
10  telephone call, defendant H. CHEN told defendant NWOBI that he
11  had opened a window at the marijuana grow house to help the
12  growth of the newly planted marijuana plants.

13      36.  On October 19, 2008, using coded language in a
14  telephone call, defendant LIU told defendant M. CHEN that he had
15  already watered the marijuana plants and that they had grown
16  large.

17      37.  On October 20, 2008, using coded language in a
18  telephone call, defendant NWOBI instructed defendant H. CHEN on
19  how to take care of marijuana plants.

20      38.  On October 20, 2008, using coded language in a
21  telephone call, defendants LY and H. CHEN discussed the condition
22  of the marijuana plants they were growing.

23      39.  On October 22, 2008, using coded language in a
24  telephone call, defendants NWOBI and H. CHEN discussed the
25  condition of the marijuana plants they were growing.

26      40.  On October 22, 2008, using coded language in a
27  telephone call, defendant NWOBI instructed defendant H. CHEN to
28  call defendant NWOBI with any questions about how to take care of

the marijuana plants.

41.  On October 22, 2008, defendant H. CHEN drove to defendant NWOBI's marijuana grow house located on Peppercorn Drive in Santa Clarita, California (the "Peppercorn Drive Grow House").

42.  On October 22, 2008, using coded language in a telephone call, defendant M. CHEN agreed to buy marijuana-growing equipment for defendant LIU at a home improvement store.

43.  On October 22, 2008, using coded language in a telephone call, defendant LIU instructed defendant M. CHEN to place a cover on an air conditioning unit inside a marijuana grow house in order to keep light from shining through.

44.  On October 23, 2008, using coded language in a telephone call, defendant LIU asked an unindicted co-conspirator employed at a marijuana dispensary if the marijuana dispensary had marijuana plant clones available for purchase.

45.  On October 23, 2008, using coded language in a telephone call, defendant LIU told an unidentified co-conspirator who worked at a marijuana dispensary that he (defendant LIU) would probably take four marijuana plant clones when they were ready the following week.

46.  On October 23, 2008, using coded language in a telephone call, defendant SIINO told defendant LIU that he had MDMA tablets marked with "Red Buddha" logos that were good quality and that he could provide defendant LIU with a few thousand tablets if defendant LIU wanted them.

47.  On October 23, 2008, using coded language in a telephone call, defendant LIU asked defendant SIINO if he had

10,000 MDMA tablets available for sale, and defendant SIINO told defendant LIU that he would charge defendant LIU $4.00 per tablet.

48.   On October 24, 2008, using coded language in a telephone call, defendant M. CHEN told defendant LIU that the "pH" levels of the water for their marijuana plants was good.

49.   On October 25, 2008, using coded language in a telephone call, defendant LY told defendant H. CHEN that he had defendant H. CHEN's payment for his labor in the marijuana grow house.

50.   On October 26, 2008, using coded language in a telephone call, defendants LIU and M. CHEN discussed watering and caring for their marijuana plants.

51.   On October 27, 2008, using coded language in a telephone call, defendant H. CHEN updated defendant NWOBI on the condition of their marijuana plants, and defendant NWOBI instructed defendant H. CHEN to bring him marijuana-growing supplies.

52.   On October 29, 2008, using coded language in a telephone call, defendant LY told defendant H. CHEN that he planned to work with defendant NWOBI until February 2009, and defendants LY and H. CHEN discussed starting their own marijuana grow operation.

53.   On October 29, 2008, using coded language in a telephone call, defendant LIU told an unidentified co-conspirator at a marijuana dispensary that he would pick up four marijuana plant clones from the dispensary the next day.

54.   On November 2, 2008, using coded language in a

11

telephone call, defendant LIU scolded defendant M. CHEN for not taking proper care of their marijuana plants and told defendant M. CHEN that 10 of the plants were falling over.

55.  On November 13, 2008, defendant SU drove his car to the Peppercorn Drive Grow House.

56.  On November 13, 2008, defendant NWOBI removed marijuana clippings and marijuana-growing equipment from the Peppercorn Drive Grow House and disposed of them in a trash dumpster in Gardena, California.

57.  On December 4, 2008, defendants NWOBI and SU possessed approximately 920 marijuana plants at the Peppercorn Drive Grow House.

58.  On December 4, 2008, defendants NWOBI and LY possessed approximately 1,310 marijuana plants and packaging materials at defendant NWOBI's marijuana grow house located on Laurel Canyon Boulevard in Studio City, California (the "Laurel Canyon Grow House").

59.  On December 4, 2008, at his residence in Los Angeles, California, defendant NWOBI possessed approximately $24,237 in cash, a Lamborghini Gallardo sports car, a Mercedes Benz automobile, paperwork inside his Ford Bronco containing the address of the Peppercorn Drive Grow House, and paperwork demonstrating that he owned the Laurel Canyon Grow House.

60.  On February 5, 2009, in Riverside, California, defendants LIU and M. CHEN possessed approximately six marijuana plants and 47 planter pots used to grow marijuana and defendant LIU possessed a 12-gauge shotgun.

COUNT TWO

[21 U.S.C. § 846]

A.   OBJECT OF THE CONSPIRACY

Beginning on a date unknown, and continuing to on or about August 24, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants KATRINA YU, aka "katrina<3" ("YU"), and ANDY LAI, aka "Smiley" ("LAI"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally distribute a mixture and substance containing a detectable amount of 3,4-methylenedioxymethampetamine ("MDMA"), a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

The object of the conspiracy was to be accomplished in substance as follows:

1.   Defendant LAI would obtain MDMA from unknown suppliers for further distribution.

2.   Defendant YU would obtain MDMA from defendant LAI and unknown suppliers for further distribution.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, on or about the following dates, defendants LAI and YU, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

1.    On September 11, 2009, in Rosemead, California, defendant YU and an unindicted co-conspirator possessed with intent to distribute approximately 5,000 MDMA tablets in the unindicted co-conspirator's purse.

2.    On April 26, 2010, defendant YU brokered the sale of 5,000 MDMA tablets for $11,500 to be supplied by defendant LAI, which would take place the next day.

3.    On April 27, 2010, in Rowland Heights, California, defendants YU and LAI possessed with intent to distribute approximately 5,086 MDMA tablets.

COUNT THREE

[18 U.S.C. § 371]

GENERAL ALLEGATIONS

1.    A foreign national who is lawfully married to a United States citizen may seek to obtain permanent residence status in the United States.

2.    To initiate the process of obtaining permanent residence status on the basis of a marriage to a United States citizen, the United States citizen spouse must file a visa petition (Form I-130), and the foreign national spouse must file an application for adjustment of status (Form I-485).

3.    After the visa petition and adjustment application are filed, both spouses are required to participate in at least one interview with an Adjudications Officer ("AO") from the United States Citizenship and Immigration Services (the "U.S. CIS"), the government entity responsible for evaluating and granting petitions for permanent residence based upon marriages to United States citizens (the "immigration interview").  The spouses may be interviewed separately or together.

4.    One of the purposes of the immigration interview is to attempt to determine whether the United States citizen spouse and the foreign national spouse entered into a valid marriage, or an unlawful marriage for purposes of evading the United States immigration laws (a "sham marriage").  A marriage is considered valid if the United States citizen spouse and the foreign national spouse intended to establish a life together at the time of their marriage ceremony.

5.     After the immigration interview, the AO may then decide whether to grant or deny the visa petition and the application for adjustment of status.  If the United States citizen spouse and the foreign national spouse were married less than two years prior to a grant of adjustment of status, the foreign national spouse is given permanent resident status on a conditional basis. If conditional resident status is granted, the spouses can later seek to remove the condition on residence, following the two year anniversary that such status was granted.

A.     OBJECT OF THE CONSPIRACY

Beginning on a date unknown, and continuing to on or about August 24, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants LAWRENCE LIU ("LIU"), ALLEN CHEN ("A. CHEN"), ANGELA KIM  ("A. KIM"), SYLVIA HO ("HO"), JANE KIM ("J. KIM"), SEONG CHUN TAN ("TAN"), FENG YE ("YE"), and CHUN CHIN HU ("HU"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit an offense against the United States, namely, to enter into marriage for the purpose of evading a provision of the immigration laws of the United States, in violation of Title 8, United States Code, Section 1325(c).

B.     MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
       ACCOMPLISHED

The object of the conspiracy was to be accomplished in substance as follows:

1.     Defendant A. CHEN would coordinate sham marriages between female United States citizens and male foreign nationals for pay, and would provide instruction to the couples as to how

16

to make the sham marriages appear to be valid for purposes of passing immigration interviews.

2.   Defendant LIU would assist defendant A. CHEN by acting as a middle-man between defendant A. CHEN and the female United States citizens entering into sham marriages with foreign nationals.

3.   Defendant HO, a United States citizen, would enter into a sham marriage with defendant TAN for pay, and would recruit other female United States citizens to enter into sham marriages with foreign nationals, including defendant J. KIM, for pay.

4.   Defendant J. KIM, a United States citizen, would enter into a sham marriage with defendant HU for pay.

5.   Defendant A. KIM, a United States citizen, would enter into a sham marriage with defendant YE.

6.   Defendant TAN, a national of Malaysia, would enter into a sham marriage with defendant HO for purposes of obtaining legal residency in the United States.

7.   Defendant HU, a national of Taiwan, would enter into a sham marriage with defendant J. KIM for purposes of obtaining legal residency in the United States.

8.   Defendant YE, a national of China, would enter into a sham marriage with defendant A. KIM for purposes of obtaining legal residency in the United States.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, on or about the following dates, defendants LIU, A. CHEN, A. KIM, HO, J. KIM, TAN, YE, and HU, and others known and unknown to the Grand Jury, committed various

overt acts within the Central District of California, and elsewhere, including but not limited to the following:

### The Sham Marriage Between Defendants HO and TAN

1.   On an unknown date prior to December 18, 2007, defendant HO agreed to enter into a sham marriage with a foreign national in exchange for $15,000, and agreed to recruit other female United States citizens to enter into sham marriages with foreign nationals in exchange for $4,000 for each female defendant HO recruited.

2.   On December 18, 2007, defendants HO and TAN obtained a marriage license in Los Angeles County for the purpose of entering into a sham marriage.

3.   On February 2, 2008, in the City of San Gabriel, California, defendants HO and TAN entered into a sham marriage.

4.   On February 20, 2008, defendant HO filed a visa petition (Form I-130) on behalf of defendant TAN with the U.S. CIS.

5.   On February 20, 2008, defendant TAN filed an application for adjustment of status (Form I-485) with the U.S. CIS.

6.   On September 29, 2008, in Los Angeles, California, defendants HO and TAN participated in an immigration interview in which they falsely claimed that their marriage was not a sham.

7.   On September 29, 2008, based on his sham marriage to defendant HO, defendant TAN received permanent resident status in the United States on a conditional basis.

8.   On November 9, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that defendant HO had not yet been paid for her sham marriage.

9.   On November 13, 2008, using coded language in a telephone call, defendant HO told defendant LIU that she had not yet received full payment for her sham marriage to defendant TAN.

### The Sham Marriage Between Defendants J. KIM and HU

10.   On an unknown date prior to March 3, 2008, defendant HO recruited defendant J. KIM to enter into a sham marriage with a foreign national for pay.

11.   On March 3, 2008, defendants J. KIM and HU obtained a marriage license in Los Angeles County for the purpose of entering into a sham marriage.

12.   On March 10, 2008, in El Monte, California, defendants J. KIM and HU entered into a sham marriage.

13.   On March 15, 2008, defendant J. KIM filed a visa petition (Form I-130) on behalf of defendant HU with the U.S. CIS.

14.   On March 20, 2008, defendant HU filed an application for adjustment of status (Form I-485) with the U.S. CIS.

15.   On October 18, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that defendant J. KIM was having her immigration interview in the next month.

16.   On November 12, 2008, using coded language in a telephone call, defendant A. KIM informed defendant LIU that defendant J. KIM's immigration interview was scheduled for Friday.

17.   On November 13, 2008, using coded language in a telephone call, defendants HO and LIU discussed when defendant HO would get paid for recruiting defendant J. KIM to enter into a sham marriage with defendant HU.

18.   On November 14, 2008, in Los Angeles, California, defendants J. KIM and HU participated in an immigration interview in which they falsely claimed that their marriage was not a sham.

19.   On November 14, 2008, based on his sham marriage to defendant J. KIM, defendant HU received permanent resident status in the United States on a conditional basis.

**The Sham Marriage Between Defendants A. KIM and YE**

20.   On an unknown date prior to March 13, 2008, defendant A. KIM agreed to enter into a sham marriage with a foreign national in exchange for pay.

21.   On March 13, 2008, defendants A. KIM and YE obtained a marriage license in Los Angeles County for the purpose of entering into a sham marriage.

22.   On March 17, 2008, defendant A. KIM received $2,500 in cash as partial payment for defendant A. KIM agreeing to enter into a sham marriage with defendant YE.

23.   On March 17, 2008, in Norwalk, California, defendants A. KIM and YE entered into a sham marriage.

24.   On March 18, 2008, defendant A. KIM received $2,500 in cash as partial payment for defendant A. KIM agreeing to enter into a sham marriage with defendant YE.

25.   On July 21, 2008, defendant A. KIM filed a visa petition (Form I-130) on behalf of defendant YE with the U.S. CIS.

26.  On July 21, 2008, defendant YE filed an application for adjustment of status (Form I-485) with the U.S. CIS.

27.  On October 18, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that she was concerned about her upcoming interview with immigration authorities regarding her sham marriage to defendant YE.

28.  On October 18, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that he could not reach defendant A. CHEN because defendant A. CHEN's telephone had been off for two days.

29.  On October 18, 2008, using coded language in a telephone call, defendant LIU assured defendant A. KIM that everything would be fine once he got in touch with defendant A. CHEN.

30.  On October 18, 2008, using coded language in a telephone call, defendant A. KIM asked defendant LIU if defendant A. CHEN would come back and take photographs to corroborate her sham marriage with defendant YE for the immigration interview.

31.  On October 18, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that defendants A. KIM and YE did nothing to corroborate the sham marriage, aside from taking a couple of photographs on the day of the wedding.

32.  On October 18, 2008, using coded language in a telephone call, defendant A. KIM asked defendant LIU how she should explain in the immigration interview how defendants A. KIM and YE communicate since defendant YE does not speak any English.

33.  On October 18, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that defendant A. CHEN would have photographs taken, and defendant LIU assured defendant A. KIM not to worry about the immigration interview because the questions would be emailed to her and she would just have to practice her answers with defendant YE.

34.  On October 18, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that an unidentified female was wondering whether she could enter into more than one sham marriage.

35.  On October 18, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that a person could enter into more than one sham marriage, after getting divorced, as long as that person was not caught the first time.

36.  On October 25, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that defendant A. CHEN was supposed to go to take photographs and then attend the immigration interview, but that defendant LIU had not been able to reach defendant A. CHEN because defendant A. CHEN was in China.

37.  On October 25, 2008, using coded language in a telephone call, defendant A. KIM reminded defendant LIU that defendant LIU had guaranteed defendant A. KIM that the sham marriage would last only six months, and it had already been seven months.

38.  On October 25, 2008, using coded language in a telephone call, defendant A. KIM asked defendant LIU how quickly she could get a divorce from defendant YE.

39.  On October 25, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that defendant A. KIM could get divorced soon after her immigration interview with defendant YE because that is when defendant YE would get his green card.

40.  On October 25, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that she wanted to get a divorce from defendant YE by March 2009.

41.  On October 25, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that he would talk to defendant A. CHEN and then call defendant A. KIM to arrange a meeting with defendant YE.

42.  On November 9, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that defendant A. CHEN was still in China, and that defendant LIU had not had a chance to talk to defendant A. CHEN about the upcoming immigration interview for defendants A. KIM and YE.

43.  On November 9, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that she was worried about the immigration interview because she did not speak Chinese and defendant YE did not speak English.

44.  On November 9, 2008, using coded language in a telephone call, defendant LIU assured defendant A. KIM that defendant A. CHEN knew what he was doing, as defendant A. CHEN had arranged at least 100 sham marriages already.

45.  On November 9, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that the

immigration interview was "super easy," and that defendant HO had passed the interview even though "she was an idiot."

46. On November 9, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that defendant LIU was the middle man, and that he would put defendant A. KIM in touch with defendant A. CHEN so that defendant A. CHEN could answer all of her questions.

47. On November 9, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that she wanted to expedite the process of completing the sham marriage with defendant YE because an unidentified person had offered to pay her $40,000 to enter into another sham marriage.

48. On November 9, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that he had never heard of anyone getting paid $40,000 to enter into a sham marriage and that the maximum amount paid to enter into a sham marriage was $30,000.

49. On November 9, 2008, using coded language in a telephone call, defendant A. KIM told defendant LIU that she entered into the sham marriage with defendant YE as a favor to defendant A. CHEN.

50. On November 11, 2008, using coded language in a telephone call, defendant LIU told defendant A. KIM that he had spoken to defendant A. CHEN, that defendant A. CHEN would check the schedule of the immigration interview for defendant A. KIM, and that defendant A. CHEN would also talk to defendant YE about the immigration interview.

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), (b)(1)(C)]

On or about November 29, 2007, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree," knowingly and intentionally distributed approximately 289 grams of a controlled substance containing: (1) at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and (2) a mixture and substance containing a detectable amount of 3,4-methylenedioxymethamphetamine ("MDMA"), a Schedule I controlled substance.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), (b)(1)(C);

18 U.S.C. § 2(a)]

On or about December 7, 2007, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree," knowingly and intentionally distributed approximately 150 grams of a controlled substance containing: (1) at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and (2) a mixture and substance containing a detectable amount of 3,4-methylenedioxymethamphetamine ("MDMA"), a Schedule I controlled substance.

At the above time and place, defendant STEVEN SETTINO SIINO knowingly and intentionally aided, abetted, counseled, commanded, induced, procured, and caused the commission of the offense alleged above.

COUNT SIX

[18 U.S.C. § 924(c)(1)(A)]

On or about December 7, 2007, in Riverside County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree," knowingly used and carried a firearm, namely, a Colt .357 magnum revolver, bearing serial number PN03218, during and in relation to, and possessed that firearm in furtherance of, a drug trafficking crime, namely, conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, as charged in Count One of this Indictment, and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), as charged in Count Five of this Indictment.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about January 25, 2008, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree," knowingly and intentionally distributed approximately 150 grams of a mixture and substance containing a detectable amount of 3,4-methylenedioxy-methamphetamine ("MDMA"), a Schedule I controlled substance.

At the above time and place, defendant STEVEN SETTINO SIINO knowingly and intentionally aided, abetted, counseled, commanded, induced, procured, and caused the commission of the offense alleged above.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about June 3, 2008, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree," knowingly and intentionally distributed approximately 154 grams of a mixture and substance containing a detectable amount of 3,4-methylenedioxymethamphetamine ("MDMA"), a Schedule I controlled substance.

COUNT NINE

[18 U.S.C. § 922(a)(1)(A)]

From on or about July 10, 2007, through on or about June 3, 2008, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree," not being a licensed importer, licensed manufacturer, or licensed dealer, knowingly engaged in the business of importing, manufacturing, and dealing in the following firearms on the following dates:

| DATE | | FIREARMS |
|------|------|------|
| July 10, 2007 | (1) | a Vulcan 9 millimeter semi-automatic handgun, bearing serial number G5420; and |
| | (2) | a Norinco 7.62 x 39 rifle, bearing serial number 9306308. |
| July 26, 2007 | (1) | a Ruger .44 caliber handgun, bearing serial number 550-54558. |
| December 7, 2007 | (1) | a Colt .357 magnum handgun, bearing serial number PN03218. |
| January 25, 2008 | (1) | a Star 9 millimeter handgun, bearing serial number 1806451. |
| June 3, 2008 | (1) | a Smith and Wesson .22 caliber handgun. |

COUNT TEN

[18 U.S.C. § 922(g)(1)]

On or about July 10, 2007, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree" ("CARRIERE"), knowingly possessed firearms, namely, a Vulcan 9 millimeter semi-automatic handgun, bearing serial number G5420, and a Norinco 7.62 x 39 rifle, bearing serial number 9306308, in and affecting interstate and foreign commerce.

Such possession occurred after defendant CARRIERE had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely, Possession of a Controlled Substance, in violation of California Health and Safety Code Section 11377(a), in the Superior Court of the State of California, Los Angeles County, case number KA078293, on or about March 9, 2007.

COUNT ELEVEN

[18 U.S.C. § 922(g)(1)]

On or about July 26, 2007, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree" ("CARRIERE"), knowingly possessed a firearm, namely, a Ruger .44 caliber handgun, bearing serial number 550-54558, in and affecting interstate and foreign commerce.

Such possession occurred after defendant CARRIERE had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely, Possession of a Controlled Substance, in violation of California Health and Safety Code Section 11377(a), in the Superior Court of the State of California, Los Angeles County, case number KA078293, on or about March 9, 2007.

COUNT TWELVE

[18 U.S.C. § 922(g)(1)]

On or about December 7, 2007, in San Bernardino County, within the Central District of California, defendant KYLE CARRIERE, also known as "Tree" ("CARRIERE"), knowingly possessed a firearm, namely, a Colt .357 magnum handgun, bearing serial number PN03218, in and affecting interstate and foreign commerce.

Such possession occurred after defendant CARRIERE had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely, Possession of a Controlled Substance, in violation of California Health and Safety Code Section 11377(a), in the Superior Court of the State of California, Los Angeles County, case number KA078293, on or about March 9, 2007.

33

COUNT THIRTEEN

[21 U.S.C. §§ 846, 841(b)(1)(C)]

On or about October 9, 2008, in Riverside County, within the Central District of California, defendants KYLE CARRIERE, also known as "Tree," and RICHIE LE knowingly and intentionally attempted to possess with intent to distribute approximately 8,000 tablets containing a mixture and substance containing a detectable amount of 3,4-methylenedioxymethamphetamine ("MDMA"), a Schedule I controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii)]

On or about December 4, 2008, in Los Angeles County, within the Central District of California, defendants NATHAN NWOBI and EDWARD SU knowingly and intentionally manufactured, and possessed with intent to distribute, at least 100 marijuana plants, that is, approximately 920 marijuana plants, a Schedule I controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii)]

On or about December 4, 2008, in Los Angeles County, within the Central District of California, defendants NATHAN NWOBI and BRIAN LY knowingly and intentionally manufactured, and possessed with intent to distribute, at least 1,000 marijuana plants, that is, approximately 1,310 marijuana plants, a Schedule I controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(D)]

On or about February 5, 2009, in Riverside County, within the Central District of California, defendants LAWRENCE LIU and MICHAEL CHEN knowingly and intentionally manufactured, and possessed with intent to distribute, marijuana, a Schedule I controlled substance.

## COUNT SEVENTEEN

### [18 U.S.C. § 924(c)(1)(A)]

On or about February 5, 2009, in Riverside County, within the Central District of California, defendant LAWRENCE LIU knowingly used and carried a firearm, namely, a Charles Daly 12-gauge shotgun, serial number 6502808, during and in relation to, and possessed that firearm in furtherance of, a drug trafficking crime, namely, conspiracy to manufacture marijuana, in violation of 21 U.S.C. § 846, as charged in Count One of this Indictment, and the manufacture of, and possession with intent to distribute, marijuana, in violation of 21 U.S.C. § 841(a)(1), as charged in Count Sixteen of this Indictment.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about September 11, 2009, in Los Angeles County, within the Central District of California, defendant KATRINA YU, also known as "katrina<3," knowingly and intentionally possessed with intent to distribute approximately 5,000 tablets containing a mixture and substance containing a detectable amount of 3,4-methylenedioxymethamphetamine ("MDMA"), a Schedule I controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about April 20, 2010, in Los Angeles County, within the Central District of California, defendants KATRINA YU, also known as ("aka") "katrina<3," and ANDY LAI, aka "Smiley," knowingly and intentionally possessed with intent to distribute approximately 5,086 tablets containing a mixture and substance containing a detectable amount of 3,4-methylenedioxy-methamphetamine ("MDMA"), a Schedule I controlled substance.


A TRUE BILL

_____
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RODRIGO A. CASTRO-SILVA
Assistant United States Attorney
Chief, Organized Crime
 Drug Enforcement Task Force Section

KEVIN S. ROSENBERG
Assistant United States Attorney
Deputy Chief, Organized Crime
 Drug Enforcement Task Force Section

RASHA GERGES
Assistant United States Attorney
Organized Crime Drug Enforcement
 Task Force Section